IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| NICLAS WASCHLE, deceased, by and through his personal representative, PATRICIA BIRKHOLD-WASCHLE, as personal representative of the Estate of Niclas Waschle, PATRICIA BIRKHOLD-WASCHLE, individually, RAIMUND WASCHLE, individually, and PHILIP WASCHLE, individually,<br><br>        Plaintiffs,<br><br>vs.<br><br>WINTER SPORTS, INC. d/b/a WHITEFISH MOUNTAIN RESORT, a Montana corporation, WORLD EXPERIENCE d/b/a WORLD EXPERIENCE TEENAGE STUDENT EXCHANGE, and JOHN DOES 1-10,<br><br>        Defendants. | CV 13-309-M-DWM<br><br>OPINION and ORDER<br><br>**FILED**<br><br>NOV 1 0 2015<br><br>Clerk, U.S District Court District Of Montana Missoula |

This case arises out of the death of sixteen-year-old German foreign exchange student Niclas Waschle ("Niclas"). On December 29, 2010, Niclas died following a ski accident that occurred at Whitefish Mountain Resort, a ski area owned and operated by Defendant Winter Sports, Inc. ("Winter Sports"). At the time of his death, Niclas had been placed with a host family, Defendants Fred and

Lynne Vanhorn ("the Vanhorns"), in Columbia Falls, Montana through the exchange program of Defendant World Experience. Niclas's family and estate ("Plaintiffs") brought suit against World Experience, Winter Sports, and the Vanhorns. World Experience was dismissed upon stipulation of the parties. (Doc. 44.) Following oral argument, the Vanhorns' motion for summary judgment was granted and judgment entered in their favor. (Docs. 65, 67.) Plaintiffs have since appealed that decision. (Doc. 74.)

Pending before the Court are Winter Sports's motion for summary judgment, (Doc. 49), Plaintiffs' motion for summary judgment on their negligence claim, (Doc. 56), and the parties' joint motion to stay trial pending the outcome of Plaintiffs' appeal, (Doc. 85). Following argument on the two summary judgment motions on October 27, 2015, Winter Sports's motion is granted-in-part and denied-in-part, Plaintiffs' motion is denied, and the parties' joint motion to stay is granted.

## BACKGROUND[1]

In 2010, Niclas applied for placement as a foreign exchange student with World Experience. In his application, Niclas indicated that he was interested in

---

[1]     The following facts are undisputed unless otherwise noted. (*See* Docs. 51, 58, 69, and 72.)

2

skiing, that he was a frequent skier, and that he was a good skier. Before coming to the United States, Niclas skied in Europe approximately five or six times a year since the age of ten. The Vanhorns applied as host parents with World Experience and advised that they lived near a ski resort and skied frequently. World Experience placed Niclas with the Vanhorns for the 2010 fall school semester.

In September 2010, Fred Vanhorn contacted Niclas's mother about purchasing a ski pass for Whitefish Mountain. She provided both permission to purchase the ski pass and funds to do so. Once the ski season began, Niclas skied ten days at Whitefish Mountain between December 5, 2010, and December 29, 2010. At approximately 11:00 a.m. on December 29, 2010, Niclas was found unresponsive, headfirst in the snow at the base of a tree by other skiers on a run off the T-Bar 2 ski lift, within the boundary of Whitefish Mountain. Niclas had fallen into what is known as a "tree well." The area was not blocked off in any way, and there were no warnings posted regarding the dangers of tree wells. Four days later, on January 2, 2011, Niclas died in the hospital.

According to Winter Sports, the ski area has been in operation on Big Mountain since 1947 and consists of approximately 3,000 acres of ski terrain, including groomed areas and large areas of ungroomed tree skiing and natural terrain (commonly called "off-piste"). (Winter Sports's SUF, Doc. 51 at ¶¶ 1-2.)

In the sixty years of operation prior to Niclas's death, four skier deaths were believed to involve tree wells. (*Id.* at ¶ 5.) As of December 29, 2010, there had not been a tree well death at Whitefish Mountain since 1999, and no deaths involving tree wells had occurred near the T-Bar 2 lift.[2] (*Id.*)

## SUMMARY CONCLUSION

Tree wells did not fall under the definition of "inherent dangers and risks of skiing" as outlined in Montana's Skier Responsibility statutes in effect at the time of the accident. *See* Mont. Code Ann. § 23-2-702(2) (2009). The statute was amended in 2015 to specifically reference the inclusion of snow accumulation around or near trees. To hold that the 2009 statute covers tree wells would render the 2015 Montana Legislature's actions to the amen corner of the ski operator's industry. Whether Winter Sports should have exercised greater care in warning of tree wells or reducing the risk, and whether Niclas should have been aware of the condition that caused his death and exercised greater care to avoid it, are issues for the finder of fact to resolve. Plaintiffs' claim for punitive damages raises a fact question as they have put forth sufficient evidence from which a reasonable juror could find actual malice as defined by Montana law.

---

[2] Less than two weeks after Niclas's death, another skier died in similar circumstances. As of the date of argument on this motion, two more skiers have died in tree wells on this mountain. (*See* Doc. 72-19 (incident reports of 2014 deaths).)

4

## LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. "[I]n ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam) (internal quotation marks and alterations omitted).

## ANALYSIS

### A.    Montana Skier Responsibility Statutes

Under Montana law, "[a] skier shall accept all legal responsibility for injury or damage of any kind to the extent that the injury or damage results from inherent dangers and risks of skiing." § 23-2-736(4). "Inherent dangers and risks of skiing" are defined generally as "those dangers or conditions that are part of the sport of skiing," and include in relevant part:

(b)     snow conditions as they exist or as they may change, including ice, hardpack, powder, packed powder, wind pack, corn snow, crust, slush, cut-up snow, and machine-made snow; [and]

. . . .

(i)     the failure of a skier to ski within that skier's ability.

§ 23-2-702(2)(2009). Likewise, under another law, a ski area operator must act "consistently with the duty of reasonable care owed by a ski area operator to a skier." § 23-2-733. Montana's Skier Responsibility statutes cannot be read to immunize ski resorts from their own negligent or intentional acts. Such an interpretation would violate Montana's constitution. *Mead v. M.S.B., Inc.*, 872 P.2d 782, 788 (Mont. 1994). However, the stated purpose of the skier statutes is to "discourage[] claims based on damages resulting from the inherent risks of skiing." § 23-2-731. Winter Sports argues that because tree wells were an "inherent danger and risk of skiing" and Niclas failed to ski within his abilities, Plaintiffs' claims fail as a matter of law. Winter Sports is wrong on both counts unless a jury is convinced by the facts that its position is correct.

### 1.     Snow Conditions

Winter Sports insists tree wells are an "inherent danger and risk of skiing" because they fell under the 2009 statutory definition of "snow conditions," which included: "snow conditions as they exist or as they may change, including ice,

6

hardpack, powder, packed powder, wind pack, corn snow, crust, slush, cut-up snow, and machine-made snow." § 23-2-702(2)(b). Plaintiffs disagree, arguing that tree wells did not fall under the plain meaning of the statute as made clear by the addition of tree well-specific language in 2015. Plaintiffs are correct.

"In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted."[3] *Small v. Bd. of Trustees, Glacier Cnty. Sch. Dist. No. 9*, 31 P.3d 358, 362 (Mont. 2001) (internal quotation marks and alteration omitted); § 1-2-101. Under Montana law, courts first interpret a statute by looking at its plain meaning, and, if the language is clear and unambiguous, no further interpretation is required. *Mont. Sports Shooting Ass'n, Inc. v. St., Mont. Dep't of Fish, Wildlife, & Parks*, 185 P.3d 1003, 1006 (Mont. 2008). If the words of a statute are ambiguous, however, the next step is to determine the intent of the legislature. *Id.*; *see also* § 1-2-102.

Here, whether the 2009 snow conditions provision covers tree wells is not clear from the plain language of the statute. According to a Winter Sports's expert, Paul Baugher, "[a] tree well is the void around the base of a fir tree

---

[3]     A federal court sitting in diversity interprets a state statute applying state rules of statutory construction. *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 527 (9th Cir. 2001).

containing a mix of low hanging branches, loose snow, and air." (Doc. 51-13 at ¶

2.) As such, a tree well does not fall under any of the express categories of snow

enumerated in the statute, nor does it have the same essential characteristics. A

tree well is more properly characterized as an absence of snow, making it unclear

whether it falls under a definition that generally describes different types of snow

pack. The ambiguity concerning the issue of whether snow means the absence of

snow under a tree was reason for ski operators to seek the help of the Montana

Legislature in making the law clear.

When considering legislative intent, courts "must presume in construing

th[e] statute[] that the Legislature intended to make some change in existing law

by passing it." *Mont. Sports Shooting Ass'n, Inc.*, 185 P.3d at 1006. The

Legislature amended the snow conditions provision of the statute, effective

October 1, 2015. It now reads,

> snow conditions as they exist or as they may change, including ice,
> hardpack, powder, packed powder, wind pack, corn snow, crust, slush,
> cut-up snow, and machine-made snow *of any depth or accumulation,*
> *including but not limited to any depth or accumulation around or near*
> *trees or snowmaking equipment.*

2015 Mont. Laws Ch. 59 (S.B. 164) (emphasis denotes added language). Winter

Sports insists both the old and new version generally cover tree wells because the

additional language merely clarifies the existing language and is not specific to

8

tree wells. That interpretation of the statute is inaccurate and would improperly render the later-enacted language regarding snow accumulation idle. Courts "must presume that the Legislature would not pass useless or meaningless legislation." *Mont. Sports Shooting Ass'n, Inc.*, 185 P.3d at 1006. The reading Winter Sports makes would send the Legislature to its amen corner and is inapposite to Montana law:

> Effect of amendment of statute. Where a section or a part of a statute is amended, it is not to be considered as having been repealed or reenacted in the amended form, but the portions which are not altered are to be considered as having been the law from the time they were enacted, and the new provisions are to be considered as having been enacted at the time of amendment.

§ 1-2-203; *see St. ex rel. Nagle v. Leader Co.*, 37 P.2d 561, 563 (Mont. 1934) ("An 'amendment' is a legislative act designed to change some prior and existing law by adding to or taking from it some particular provision.").

The circumstances surrounding the amendment also indicate the language was changed to specifically address tree wells. When the sponsor of the amendment Senator Brian Hoven testified before the House Committee on Business and Labor of the Montana 64th Legislature on February 9, 2015, he stated: "On line 16 and 17 the change is 'of any depth or accumulation, including, but not limited to any depth or accumulation around or near trees or snow making

equipment.' *This refers to tree wells. That talks about tree wells.*" (Doc. 69-21 at

11 (emphasis added); *see also* Doc. 69 at ¶ 41 (providing a more complete

discussion of legislative history).) Accordingly, the statute in effect in 2010 did

not cover tree wells, and, as a result, they were not an "inherent danger or risk of

skiing" under the Montana Skier Responsibility statutes and were not one of the

dangers or risks for which Niclas was statutorily required to be aware. *See* § 23-2-

736(1) ("A skier has a duty . . . to be aware of the inherent dangers and risks of

skiing.").

### 2.    Skiing Ability

"Inherent dangers and risks of skiing" include "the failure of a skier to ski

within that skier's ability." § 23-2-702(2)(i). "A skier has the duty to ski at all

times in a manner that avoids injury to the skier and others and to be aware of the

inherent dangers and risks of skiing." § 23-2-736(1). Additionally, Montana

statute requires a skier to "know the range of the skier's ability and safely ski

within the limits of that ability . . . so as to negotiate any section of terrain or ski

slope and trail safely and without injury or damage." § 23-2-736(2)(a). A skier is

also statutorily required to "know that the skier's ability may vary because of ski

slope and trail changes caused by weather, grooming changes, or skier use." *Id.*

Winter Sports argues that because Niclas fell, he failed to ski within his

10

ability and that, in order for Niclas to have been in the position in which he was found in the tree well, he would have had to have fallen prior to reaching the tree well and slid into it. On the other hand, Plaintiffs insist there is no evidence that Niclas was skiing beyond his abilities or that he intentionally left the groomed trail. According to Plaintiffs, the tree well itself could have been the cause of Niclas's fall, and even experienced skiers fall prey to them. (Pls.' SDF, Doc. 69 at ¶ 33 (summarizing testimony from experienced skiers that have fallen into tree wells); *see also* Baugher Snow Immersion article,[4] Doc. 58-16 at 4 (noting that *any* skier or snowboarder who leaves the groomed trail is vulnerable to tree wells); Baugher Expert Report, Doc. 60-1 at 13 (table indicating three of the prior tree well deaths were advanced skiers).) Under the reasoning of Winter Sports, anytime an Olympic skier falls it proves that the skier is skiing beyond his or her ability even if the skier had previously completed a faster, flawless run on the same course. Plaintiffs also present evidence that Niclas was a careful skier who generally stayed on groomed runs, (Doc. 69 at ¶¶ 34, 35; Winter Sports's SUF, Doc. 51 at ¶ 11), despite the fact that he was found off trail in a tree well, (Doc. 51 at ¶ 12). Accordingly, whether Niclas was skiing within his ability at the time of

---

[4]     Paul Baugher, *Risk Trends at U.S. and British Columbia Ski Areas: An Evaluation of the Risk of Snow Immersion versus Avalanche Burials* (2006).

the accident is a question of fact to be resolved by the jury.

### 3.    Duty of Reasonable Care

Winter Sports, as a ski area operator, owed Niclas a duty of reasonable care. *See* § 23-2-733. Plaintiffs argue that Winter Sports breached that duty by failing to warning of the tree well hazard and by failing to take actions to limit the associated risk. A genuine issue of material fact exists as to whether Winter Sports failed to act consistently with its duty of care under the circumstances, particularly given the catastrophic consequences of a skier encountering a tree well.

Ski area operators that have altered the landscape to make it more challenging for advanced skiers have a duty of care to warn of such man-made hazards. *Solis v. Kirkwood Resort Co.*, 114 Cal. Rptr. 2d 265, 272 (Ct. App. 2001) ("[A] resort cannot increase the risks associated with skiing without incurring a duty of care towards its patrons."). In the case of naturally-occurring, inherent dangers, providing general warnings of unmarked hazards may be sufficient so long as the foreseeability of harm from the specific hazard in question is apparent to the skier. *Kopeikin v. Moonlight Basin Mgmt., LLC*, 90 F. Supp. 3d 1103, 1108 (D. Mont. 2015) (involving subsurface rocks); *see also Wright v. Mt. Mansfield Lift, Inc.*, 96 F. Supp. 786, 790 (D. Vt. 1951) (involving a snow-covered stump).

12

However, a ski area operator violates its duty of reasonable care if it has the ability to eliminate a risk, through specific warnings or otherwise, and fails to do so. *See Oberson v. U. S. Dep't of Agr.*, 514 F.3d 989, 999 (9th Cir. 2008).

In *Kopeikin*, a skier was injured after hitting subsurface rocks below a defunct cat track. 90 F. Supp. 3d at 1104-05. This Court concluded that the ski area operator had acted consistently with its duty of care because it posted general warning signs, it had previously attempted to fix the cat track, and the injured skier knew it was a low snow year and was generally aware of the danger of rocks, despite the fact that the rock he hit was covered in snow. *Id.* at 1108. By contrast, in *Oberson*, a snowmobiler was seriously injured after being hit in the head by a snowmobile below an unmarked, steep drop in a designated snowmobile trail. 514 F.3d at 994-95. The Forest Service argued that the drop was a "variation in terrain" and thus fell under the inherent risk provision of Montana's snowmobile statutes. *Id.* at 999. Following a bench trial in the district court, the Ninth Circuit affirmed a factual and legal decision to the contrary, concluding "[t]he risk under consideration [wa]s not a variation in terrain, but a hazardous condition of the trail which could with reasonable care have been readily eliminated by altering the trail or posting a warning sign." *Id.*

Here, like the situation in *Kopeikin*, trees on a mountain and accumulated

13

snow are naturally forming. However, unlike the situation in *Kopeikin*, and more comparable to that in *Oberson*, a tree well does not fall under the old statutory framework of "inherent dangers and risks," and there is a genuine factual dispute as to both Winter Sports's and Niclas's knowledge of the risk and the effectiveness of warnings.

Plaintiffs have presented evidence that Winter Sports was on notice of the potential danger of tree wells prior to 2010 as a result of four previous deaths, (Pls.' SUF, Doc. 58 at ¶ 6), a Special Bulletin provided to Whitefish Mountain by the National Ski Area Association dated August 2008 on the subject of "Snow Immersion Deaths," (*id.* at ¶ 8), and early publications and lectures on the topic, including those by defendant's expert, Paul Baugher, (*id.* at ¶ 9).[5] (*See generally* Doc. 69 at ¶ 30.) Plaintiffs further insist that Winter Sports knew of available industry signage on tree wells, (Doc. 58 at ¶ 9), and was specifically aware of "daily" tree well incidents taking place on the T-Bar 2 lift, (Doc. 69 at ¶ 31).

Although Winter Sports concedes four deaths related to tree wells have occurred over the last 60 years, it challenges whether such information amounts to notice as no tree well deaths had occurred at Whitefish Mountain since 1999,

---

[5] In his 2006 article, Paul Baugher reviews a field test performed on skiers and snowboarders immersed in tree wells wherein only three of the ten test subjects were able to successfully extricate themselves from a tree well without outside assistance. (Doc. 58-16 at 5.)

(Winter Sports's SDF, Doc. 72 at ¶ 6), and none of those previous deaths occurred near the T-Bar 2 lift, (Doc. 51 at ¶ 5). Winter Sports also notes that it had approximately 2.9 million visitors from 1999 to 2010 and no tree well deaths occurred. (*Id.* at ¶ 4.) Despite these arguments, Winter Sports acknowledges three tree well deaths on its mountain since Niclas's death. Winter Sports further insists it was not aware of specific tree well signage prior to 2010 and that the information provided to ski areas was more of a general notice than a directive. (Doc. 72 at ¶ 9.) Inherent in Whitefish Mountain's argument is that, at that time, no one knew the extent of the risk. That lack of knowledge can cut two ways, however, raising the question as to whether the risk was foreseeable to Niclas.

A fact dispute exists as to whether Niclas was aware of the tree wells present on T-Bar 2 lift that day. While Niclas had been warned of the danger of tree wells during a safety talk with the Vanhorns, (Order, Doc. 65 at 13),[6] there were no specific or general warning signs posted at the ski hill disclosing the dangers of tree wells, (Doc. 69 at ¶ 27). There is also no proof that Niclas had skied down the particular run before. *See Mead*, 872 P.2d at 790 (reversing summary judgment where injury was caused by exposed rock face at a ski area in

---

[6] Although Plaintiffs dispute the fact such a talk ever occurred, they present only speculation in response to deposition testimony of the Vanhorns that such a warning was provided.

part on the grounds that there was no evidence the injured skier was aware of the particular condition that caused his injury or had skied the trail recently enough that he should have been aware). And, because Niclas died as a result of the accident, what he knew as he approached the hazard and what he may have seen are unknown. *See Hoar v. Great E. Resort Mgmt., Inc.*, 506 S.E.2d 777, 785 (Va. 1998) (noting that the injured skier was unable to testify as to whether the edge of run was plainly visible due to his injuries).

Additionally, a winter storm had just occurred, dumping new powder on the mountain, (Doc. 69 at ¶¶ 54, 79), arguably changing the nature of the runs Niclas may have been accustomed to. According to Baugher's expert report, the summit had a total of 9" of new snow that had fallen on the previous seven days, and, in the early morning of December 29, there was 5" of new snow, it was snowing heavily, and winds were blowing in excess of 20 miles per hour. (Doc. 60-1 at 7.) Both parties agree that powder conditions are conducive to tree well formation. (Doc. 69 at ¶ 28; Doc. 51 at ¶¶ 16-18.) The "snow immersion" article authored by Baugher also indicates that December and January generally have the most tree well incidents, as the snowpack has not had the opportunity to consolidate under the trees, and that "[b]ig precipitation events are usually associated with [snow immersion incidents]." (Doc. 58-16 at 5.)

Ultimately, whether Winter Sports should have exercised greater care in warning of tree wells or reducing the risk, and whether Niclas should have been aware of the condition that caused his death and exercised greater care to avoid it, are issues for the finder of fact to resolve. *See Mead*, 872 P.2d at 790-91. While the facts and issues generally track *Kopeikin*, the nature and foreseeability of the risk make it distinguishable. So does the interpretation of the now-amended statute. As stated by Baugher, "[t]he greatest single component of snow immersion risk is that it is substantially under-appreciated." (Doc. 58-16 at 7.)

Nor is the determination of causation properly subject to summary judgment. The parties have presented evidence both supporting and refuting the effectiveness of warnings[7] in this particular case. As argued by Plaintiffs, Niclas was a cautious skier known to ski groomed runs. (Doc. 51 at ¶ 11.) And, pursuant to the Montana Skier Responsibility statutes, a skier had the obligation to "obey all posted or other warnings and instructions of the ski area operator." § 23-2-736(2)(d). However, Winter Sports insists warnings would not make a difference as they had warnings in place four years later, when an additional two skiers died following immersion in tree wells. (*But see* "Treewell Safety" page for

---

[7]    "Warnings" as referring to signs on trails, notices on trail maps, safety information available on the ski area's website, and other notices to the public.

17

Whitefish Mountain Resort, Doc. 72-12 (stating that "[f]ortunately, these types of [snow immersion] accidents are preventable.").) Based on the evidence presented, a reasonable juror could find either that Niclas would have heeded a sufficient warning, preventing his injury, or that a warning would not have changed his behavior or even that the warnings themselves are inadequate. *See Hoar*, 506 S.E.2d at 786 (concluding that in a case where the injured skier was too injured to testify as to whether a warning would have altered his behavior, "[a] verdict may be properly based upon reasonable inferences drawn from the facts"). Thus, a genuine issue of material fact remains as to whether the failure to post warning signs or take other preventative measures was the cause of Niclas's death. *See Graven v. Vail Assocs., Inc.*, 909 P.2d 514, 520-21 (Colo. 1995) (en banc) (determining factual dispute as to whether slush, trees, a ravine, or the failure to post warning signs was the cause of the skier's fall into a ravine and resulting injuries); *see Oberson*, 514 F.3d at 1000 (noting that the district court found *after the proof was presented at trial* that a warning sign would have changed the participant's expectancies and informed them of steeper grade).

## B.     Respondeat Superior

Plaintiffs have withdrawn their respondeat superior claims against Winter Sports. (*See* Minute Entry, Oct. 27, 2015 Motions Hearing, Doc. 89.)

Accordingly, summary judgment is granted in favor of Winter Sports as to Count

V of the Amended Complaint. (Doc. 32.)

## C.   Punitive Damages

Finally, Winter Sports argues Plaintiffs' punitive damages claim fails as a

matter of law because there is no evidence of actual malice. To prevail on their

claim for punitive damages, Plaintiffs must show that Winter Sports acted with

actual malice. § 27-1-221. Montana law provides in relevant part:

> A defendant is guilty of actual malice if the defendant has knowledge of
> facts or intentionally disregards facts that create a high probability of
> injury to the plaintiff and: (a) deliberately proceeds to act in conscious
> or intentional disregard of the high probability or injury to the plaintiff;
> or (b) deliberately proceeds to act with indifference to the high
> probability of injury to the plaintiff.

§ 27-1-221(2). Each of the elements of a punitive damages claim must be proved

by clear and convincing evidence. § 27-1- 221(5). Clear and convincing evidence

is defined as "evidence in which there is no serious or substantial doubt about the

correctness of the conclusions drawn from the evidence. It is more than a

preponderance of the evidence but less than beyond a reasonable doubt." *Id.*

"An award of punitive damages requires a showing of something more than

gross negligence." *Dunn v. Ancra Int'l LLC*, 2011 WL 4478478, at *5 (D. Mont.

Sept. 26, 2011) (citing *Cashin v. N. Pac. Ry. Co.*, 28 P.2d 862, 869 (Mont. 1934)).

19

Only upon clear and convincing proof that Winter Sports had knowledge of facts, or intentionally disregarded facts, that created a high probability of injury to Niclas and deliberately proceeded to act in a conscious or intentional disregard of that high probability of injury, may Winter Sports be found guilty of actual malice. *McKay v. Wilderness Dev't, LLC*, 221 P.3d 1184, 1197 (Mont. 2009).

Plaintiffs argue that Winter Sports had knowledge of the lethal hazard posed by tree wells and purposely advertised and promoted powder skiing without providing sufficient warning of the danger. (Pls.' Br. in Opp., Doc. 68 at 35; Doc. 69 at ¶ 42.) Plaintiffs also argue Winter Sports knew that the winter storm on December 29, 2010, posed an increased risk of tree well formation, (Doc. 69 at ¶¶ 49, 54 (noting 30 mile-an-hour winds and white-out conditions)), and that Winter Sports has never closed the T-Bar 2 lift in major powder conditions, despite the potential for tree well formation, (*id.* at ¶ 28). Upon review of the record, Plaintiffs have put forth sufficient proof that Winter Sports may have had knowledge of the tree well hazard and approached it in such a way that a jury could find, by clear and convincing evidence, that its conduct was malicious as defined by § 27-1-221. Summary judgment on this issue is not appropriate

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Winter Sports's motion for

20

summary judgment (Doc. 49) is GRANTED-IN-PART and DENIED-IN-PART. It is GRANTED as to Plaintiffs' respondeat superior claim (Count V). It is DENIED in all other respects.

IT IS FURTHER ORDERED that Plaintiffs' motion for summary judgment as to the issue of negligence (Doc. 56) is DENIED.

IT IS FURTHER ORDERED that immediate appeal of the statutory interpretation of the 2009 "inherent dangers and risks" provision as it relates to tree wells is appropriate, as it "involves a controlling question of law as to which there is substantial ground for difference of opinion" and "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

IT IS FURTHER ORDERED that the parties' joint motion to stay trial (Doc. 85) pending the appeal of this Court's Opinion and Order (Doc. 65) and Judgment (Doc. 67) dismissing Defendants Fred and Lynne Vanhorn is GRANTED. The pretrial matters due November 12, 2015, through the scheduled date for trial, November 30, 2015, are STAYED pending the resolution of Plaintiffs' appeal to the Ninth Circuit Court of Appeals.

IT IS FURTHER ORDERED that the parties are to file a joint status report within thirty (30) days of the resolution of that appeal.

IT IS FURTHER ORDERED the final pretrial conference set for November 19, 2015, and the jury trial set for November 30, 2015, are VACATED.

IT IS FURTHER ORDERED that the parties' outstanding motions in limine (Docs. 52, 59, & 62) are DENIED subject to renewal at the time of trial if appropriate.

Dated this __10__ day of November, 2015.

Donald W. Molloy, District Judge
United States District Court